Michael Porter, OSB No. 003560
mike.porter@millernash.com
Iván Resendiz Gutierrez, OSB No. 154617
ivan.resendiz@millernash.com
**MILLER NASH GRAHAM & DUNN LLP**
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204
Telephone: 503.205.2330

Katherine M. Turner, D.C. State Bar No. 495528
(*pro hac vice* forthcoming)
kturner@wc.com
Troy C. Homesley, N.Y. State Bar No. 5566914
(*pro hac vice* forthcoming)
(Admitted only in N.Y.  Practice supervised by
D.C. Bar members pursuant to D.C. Court of
Appeals Rule 49(c)(8))
thomesley@wc.com
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street N.W.
Washington, D.C. 20005
Telephone: 202.434.5487

*Attorneys for Plaintiff Intel Corporation*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| INTEL CORPORATION, | Case No.: [         ] |
|       Plaintiff, | |
| v. | PLAINTIFF'S COMPLAINT; DEMAND FOR JURY TRIAL |
| VARUN GUPTA, | |
|       Defendant. | |

### PLAINTIFF'S COMPLAINT

Plaintiff Intel Corporation ("Intel") alleges the following against Defendant Dr. Varun Gupta ("Gupta"):

## I.    SUMMARY OF ACTION

1.    Gupta is a former Intel product marketing engineer who took Intel's highly confidential, proprietary and trade secret information in violation of his contractual obligations and federal and state law; leveraged that information in negotiations against Intel while at his new employer; and lied to Intel in the course of Intel's attempts to locate, recover, and protect its confidential information and trade secrets.

2.    Intel brings this action to enjoin Gupta from further possession and use of Intel's confidential information and trade secrets, to protect that information from further dissemination and use, to prevent irreparable harm to Intel's significant commercial interests, and to recover damages for the commercial harm that Gupta already has caused.

3.    Gupta worked at Intel for almost ten years prior to his voluntary resignation and departure from Intel on January 17, 2020.  Throughout the course of his employment, Gupta had direct access to documents containing Intel confidential information and trade secrets related to Intel's pricing structure and strategies, definition of the parameters, and manufacturing capabilities for customized Xeon processors, among other Intel confidential information and trade secrets.

4.    Xeon processors are used by computers and servers around the world in data centers, cloud computing, and data analytics.  These processors provide critical support for key modern applications such as artificial intelligence, autonomous driving, and high-performance computing.  Intel's technical and manufacturing capabilities, customized product offerings, and

pricing for Xeon processors are commercially sensitive and the disclosure of this information would cause significant harm to Intel.  If Intel's competitors were to gain access to this information, they could use it to compete unfairly with Intel in the definition, manufacture, marketing, and pricing of comparable products; similarly, Intel's customers could use it to gain an unfair advantage over Intel in negotiations concerning product specifications and pricing.

5.    Unbeknownst to Intel at the time, on Gupta's last day at Intel—just days after affirming in writing that he did not have possession of any Intel confidential information and trade secrets—Gupta transferred approximately **3,900** documents from his Intel-issued computer to a personal Seagate FreeAgent GoFlex USB drive bearing Serial Number NA0CTSEQ (the "Seagate Drive").

6.    Four days after leaving Intel, Gupta began working for Microsoft Corporation ("Microsoft") as a Principal of Strategic Planning in Microsoft's Cloud and Artificial Intelligence department.  In his new role at Microsoft, Gupta used the confidential information and trade secrets he misappropriated from Intel, deploying that information in head-to-head negotiations with Intel concerning customized product design and pricing for significant volumes of Xeon processors.  As a purchaser of Intel's processors, Microsoft's rational objective would be to negotiate the most advanced technical features at the lowest achievable price.  Gupta knew Intel's confidential technical and manufacturing capabilities, customized product offerings, marketing strategies, and pricing for Xeon processors, and used that confidential information and trade secrets to gain an unfair advantage over Intel in the negotiations concerning product specifications and pricing.  Gupta had no way of knowing this information but for his access to it during his employment at Intel.

7.     When Gupta began to deploy Intel's confidential information and trade secrets in negotiations against Intel, his conduct stood in stark contrast to the integrity and trust that has characterized the decades-long commercial relationship between Microsoft and Intel.  It also alerted Intel's engineering and sales team to the possibility that Gupta may also have stolen documents containing Intel's confidential information and trade secrets.  Intel's Information Security Global Forensics Team initiated an investigation to determine the nature and scope of Gupta's misappropriation.

8.     Through Intel's investigation, with the assistance of Microsoft, Intel began to discover the full breadth of Gupta's misappropriation.  Forensic analysis ultimately showed that Gupta had taken thousands of Intel documents, placed them on one or more of at least two USB drives (including the Seagate Drive), and accessed them on multiple dates throughout his employment by Microsoft.

9.     When Intel's Information Security Global Forensics Team first contacted Gupta in late July 2020 to secure the Seagate Drive, Gupta sought to thwart Intel's efforts to uncover his misappropriation by claiming that he did not know where the Seagate Drive was and that he had never plugged the Seagate Drive into any device besides his Intel-issued computer during his Intel employment.  It was only after Intel involved Microsoft in the matter that Gupta admitted to Microsoft that he did in fact have the Seagate Drive in his possession and only then that he turned it over to Microsoft for analysis.

10.     As part of its assistance in the matter, Microsoft commissioned a forensic analysis of the Seagate Drive.  This analysis showed that Gupta had plugged the Seagate Drive into various other devices after departing Intel, including his Microsoft-issued Microsoft Surface laptop (the "MS Surface") and another computer.  Intel also learned that Gupta stored at least

one of the documents containing Intel confidential information and trade secrets on his MS Surface.

11.    During Intel's July 31 conversation with Gupta, Gupta continued to conceal the existence of a second drive onto which he had copied Intel confidential information and trade secrets.

12.    Intel continued to investigate, and forensic analysis later proved that Gupta loaded Intel documents containing its confidential information and trade secrets onto at least one other USB drive—a Western Digital My Passport USB drive with an identified serial number (the "Western Digital Drive").[1]  This analysis further showed that Gupta had plugged the Western Digital Drive into the MS Surface as recently as July 23, 2020—approximately one week before his conversations with Intel, during which he continued to conceal the existence of this additional taking of Intel documents.  When Intel discovered the existence of the Western Digital Drive and sought to secure it, Gupta then claimed that he had disposed of the Western Digital Drive by throwing it out in his household trash in late July 2020—*i.e.*, shortly after his last known plug in of the device on July 23, 2020 and around the same time Intel's Information Security Global Forensics Team first contacted him.

13.    To this day, Gupta has not provided the Western Digital Drive to either Intel or Microsoft, despite being requested to do so.  He continues to maintain that he threw it away in late July 2020.  Intel has no assurance of the truth of this story, given Gupta's initial concealment of the existence of any devices onto which he had copied Intel documents.  Of course, it is also

---

[1] Gupta has contended that he discarded the Western Digital Drive by putting it in a box with other electronic devices and cords that was later put out with the household trash.  If this story is true, it is not inconceivable that the Western Digital Drive is in the hands of another, as opposed to buried in a landfill.  Accordingly, Intel does not include the serial number in this Complaint, but has identified it to Gupta.

possible that Gupta still possesses the drive or knows of its whereabouts but nevertheless continues to conceal it. Either way, Intel has no way of obtaining the drive and does not know its current location. This leaves Intel exposed to an ongoing risk that its confidential information and trade secrets will be distributed and used. Intel also does not know the extent to which Gupta otherwise retains possession of Intel confidential information and trade secrets or whether Gupta has distributed or will distribute that confidential information to others, and therefore, "[m]isuse of that treasure trove remains an ever-present danger wholly at [Gupta's] whim." *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939, 2017 WL 2123560, at *11 (N.D. Cal. May 15, 2017).

14.     Gupta flagrantly flouted Intel's confidentiality policies, his employment agreement, and the law. He misappropriated Intel's confidential information and trade secrets. He deployed that confidential information and those trade secrets in negotiations *against* Intel, harming Intel's negotiating position in the process. And when Intel began to discover his misappropriation, he provided false and/or misleading information about the nature and scope of his taking and use of Intel's confidential information and trade secrets, attempting to obfuscate Intel's extensive efforts to protect this information from further use or dissemination. Therefore, Intel is left with no remedy but to seek relief from this Court.

## II.     <u>PARTIES</u>

15.     Plaintiff Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara County, California.

16.     Defendant Varun Gupta is an individual. Intel is informed and believes and, therefore, alleges that Mr. Gupta resides in Portland, Oregon. He may be served at 9341 Northwest Fox Hollow Court, Portland, Oregon or wherever else he may be found.

---

### III.   <u>JURISDICTION AND VENUE</u>

17.     This Court has subject matter jurisdiction over Intel's federal trade secret claim pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), which confers original jurisdiction to federal district courts over all civil actions brought under the Defend Trade Secrets Act, and 28 U.S.C. § 1367, which confers supplemental jurisdiction over the related breach of contract claim and the claim under Oregon's trade secret misappropriation statute.

18.     In addition, this Court has diversity jurisdiction over Intel's claims pursuant to 28 U.S.C. § 1332.  Intel is informed and believes and, therefore, alleges that Gupta resides in Oregon.  Intel is a Delaware company with its headquarters and principal place of business in California.  Therefore, the parties are diverse from one another.  While precise damages are in an amount to be determined at trial, the amount in controversy exceeds $75,000.

19.     Gupta is the sole named Defendant, and Intel is informed and believes and, therefore, alleges that he resides in this judicial district.  In addition, Intel is informed and believes and, therefore, alleges that a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this Judicial District.  Venue, therefore, lies in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

20.     Intel is informed and believes and, therefore, alleges that a substantial part of the events giving rise to the claims alleged in this Complaint occurred in Washington County, Oregon.  Accordingly, this action is properly filed in the Portland Division of this Court.  Civil Local Rule 3-2(a)(1).

IV.    **BACKGROUND AND FACTUAL ALLEGATIONS**

**The Importance of Information Security at Intel**

21.    Information security is mission critical to Intel's business.  Intel's innovations have led the technological revolution.  Core to that position in the market is protecting the proprietary, highly confidential, commercially sensitive, and valuable research, inventions, product development, and marketing strategies that the company generates.

22.    Intel invests billions of dollars each year in the development, manufacturing, and marketing of its technologies.  The fruits of those investments—Intel's confidential information and trade secrets—are extraordinarily valuable.  To defend against efforts to take that information and use it to compete with or negotiate against the company, Intel has developed and deployed extensive policies and procedures designed to protect its confidential information, trade secrets, and property.

23.    Intel's Information Security Team—which consists of approximately 450 highly trained information security experts—works to maintain an extensive system of IT controls to secure Intel confidential information and trade secrets within its electronic systems.  Intel also maintains strict physical security around its headquarters and locations throughout the world.

24.    In addition, Intel's employment agreement—which employees must sign— prohibits employees from using or disclosing Intel's confidential information and trade secrets, whether during the employment (except to the extent authorized in the course of the employee's duties) or after the employment.  Employees who have had access to confidential information and trade secret information during their employment are also asked to sign a "Trade Secret Acknowledgment Form" ("TSAF") upon their departure.  The TSAF specifically identifies the categories of confidential information and trade secrets to which the departing employee has had

access and confirms the employee's contractual obligation not to use or disclose that information post-employment.

25.     Employees also are required to designate Intel confidential and trade secret information with the appropriate markings, such as "Intel Top Secret" and "Intel Confidential". These markings make it clear to anyone viewing the documents that access is restricted and that the documents bearing these markings contain Intel's confidential information and trade secrets.

26.     Intel derives much of its value from creating novel solutions to novel problems. And information security—whether as applied to source code, product development information, or commercial terms such as pricing—is vital to protecting Intel's competitive position in the marketplace.  Intel also deeply values its collaboration with customers and ecosystem partners and uses these same security protocols to safeguard third-party information.

27.     New employees learn their duties and obligations related to information security from day one, it is an integral part of Intel's culture, and they are reminded of it throughout their tenure through information security trainings, among other mechanisms, and again upon their departure.

28.     Gupta, who worked at Intel for almost ten years, was well aware of Intel's focus on information security and his obligations related to Intel's confidential and trade secret information.  Indeed, he signed the employment agreement and the TSAF described above.

### Gupta's Work at Intel

29.     Gupta is a well-educated, highly sophisticated and experienced engineer with nearly a decade of experience at Intel.  This background leaves little doubt:  Gupta understood the value of Intel's confidential information and trade secrets, and he knew exactly what he was doing when he misappropriated them.

30.     Intel is informed and believes and, therefore, alleges that prior to joining Intel, Gupta obtained numerous degrees, including a Bachelor of Technology in Engineering from the Indian Institute of Technology at Banaras Hindu University, a Master's Degree in Materials Science and Engineering from Drexel University, an additional Master's Degree in Finance and Mathematics from Rutgers University, and a Ph.D. in Materials Science and Engineering from Rutgers University.  Intel is informed and believes and, therefore, alleges that Gupta furthered his education by taking a course on the Fundamentals of Decision Quality at Stanford University while at Intel.

31.     In July 2010, Gupta began his Intel career as an engineer.  In 2014, Gupta was promoted to a managerial engineering role.  By 2016, Gupta was playing a leading role in developing customized processor configurations for certain Intel customers.

32.     In 2017, Gupta became a product marketing engineer, where he managed relationships with purchasers of Intel's customized Xeon processors and was in charge of overseeing the production and development of such processors from preliminary definition to launch.

33.     Certain Xeon processors, including Intel's Xeon Scalable processors, are used in computers and servers to provide support for the most demanding applications—including in-memory analytics, artificial intelligence, autonomous driving, high performance computing, and network transformation.  Intel also develops specialized, highly customizable Xeon processors built for the needs of specific customers.

34.     As a product marketing engineer, Gupta worked closely with all aspects of Intel's business, including finance, engineering, manufacturing, strategic planning, corporate sales, and

marketing.  These roles demanded that Gupta have extensive access to confidential documents and trade secrets touching on a range of Intel's most valuable information.

35.    Specifically, Gupta had access to Intel confidential information and trade secrets indicating development techniques, technical capability, manufacturing capacity, cost bases, marketing strategy, pricing structures, pricing decisions, and technology features for customized Xeon processors.  Because of this access, Gupta knew, for example, Intel's pricing structures for various customized product offerings.

36.    As detailed below, Gupta used this information to gain a competitive edge *against* Intel when negotiating on behalf of Microsoft for the purchase of Xeon processors.  While at Microsoft, Gupta used his knowledge and access to information about Intel's customized Xeon processor offerings to gain an advantage in negotiations with Intel.

### Gupta's Confidentiality Agreement with Intel

37.    On July 19, 2010, Gupta signed an agreement with Intel (the "Employment Agreement") that required him to maintain the confidentiality of all Intel confidential information and trade secrets, to forbear from any use of Intel's confidential information other than at the direction and for the benefit of Intel within the scope of and during his employment, and to return and not retain any Intel confidential information upon termination of his employment.  *See* Employment Agreement (**Exhibit 1**).[2]  Specifically, Gupta agreed to the following:

> At all times, both during ***and after my employment*** with any company in the Intel Group, I will not use (except for the benefit and at the direction of the Intel Group) and will hold in confidence and not disclose (without written authorization from a company in the Intel Group, except to the extent I am authorized to do so in the course of my duties) any proprietary

---

[2] Certain identifying information in this document has been redacted in accordance with Federal Rule of Civil Procedure 5.2.

information or trade secret (technical, marketing, planning, financial, personnel or otherwise) of the Intel Group or any third party to which I gain access pursuant to my employment, until such information becomes generally and rightfully known outside the Intel Group without non-disclosure restriction, or the maximum period of time for maintaining trade secrets as permitted by law in the jurisdiction in which I am employed if such period is shorter. ***I agree not to make unauthorized copies of such confidential information and to return to the Intel Group immediately upon my termination or upon request by my Employer or any other company in the Intel Group all tangible forms of such confidential information, including but not limited to drawings, computerized data or programs, specifications, documents, devices, models, employee lists, customer lists or phone books, or any other Intel Group confidential information.*** I will, at all times, treat third parties' confidential information, to which I have access during my employment by any company in the Intel Group, as if it were Intel confidential information unless I have been advised of the need to treat that third parties' confidential information differently, in which event I agree to treat such third parties' confidential information in the manner to which I have been advised. I agree that any breach, violation or evasion of this provision will result in immediate and irreparable injuries and harm to the Intel Group, and I agree that any company in the Intel Group seeking to enforce this Agreement shall have recourse to the remedies of injunction and specific performance, or either of such remedies, as well as all other legal or equitable remedies to which such company may be entitled.

Ex. 1, Employment Agreement, at ¶ 3 (emphases added).

38.     Shortly before departing Intel in January 2020, Gupta reaffirmed his contractual and legal duties with respect to Intel's confidential information and trade secrets. On January 6, 2020, Gupta signed the Intel TSAF, which identified specific categories of "trade secrets and confidential or other proprietary information" belonging to Intel, and then confirmed Gupta's obligations with respect to that information:

I acknowledge that I have been advised and am aware of my obligations concerning Intel Confidential Information, including that identified above, to which I have had access during my employment. I acknowledge that my obligations concerning Intel Confidential Information include a prohibition against posting any such information on social media, sharing this information with a future employer, or making unauthorized disclosures to the press on behalf of Intel. I signed an Employee Agreement in connection with my employment, and have been further advised that I cannot use for

my own benefit or the benefit of others any Intel Confidential Information without the prior written permission of Intel, but that I am free to use information in the public domain as well as my own skill, knowledge, and experience as long as such use does not conflict with my obligations under my Employee Agreement.

39.    Gupta also confirmed that he had returned all Intel confidential information in his possession or custody, and that he had no further Intel confidential information in his possession or custody:

> I confirm that I have returned to Intel all Intel Confidential Information, including all confidential reports, drawings, documents, process specifications, masks, product specifications, manuals, field manuals, diagnostic tools, software diagnostics, virus routines, network analysis, spare parts lists, customer lists, customer contact names, contracts and agreements, all computer files, data and software packages to which I have had access during my past employment and which are the property of Intel, its subsidiaries, customers or third parties. I also confirm that I have no such document or full or partial copies thereof or any other Intel property or material in my possession or custody anywhere.

40.    The TSAF identified specific categories of information in which Gupta had "acquired knowledge or had access to trade secrets and confidential or other proprietary information of Intel Corporation," including, but not limited to, financial and pricing information and yield trends for Xeon processors.

41.    Under these agreements, Gupta was prohibited from copying or using any Intel confidential information or trade secrets for his own benefit—or the benefit of anyone other than Intel—at any time. Further, Gupta was required to return all Intel confidential information to Intel upon his departure. Finally, by signing the TSAF, he represented that he had no Intel documents in his possession or custody. That representation was false: forensic analysis indicates that Gupta copied Intel confidential information and trade secrets onto the Seagate Drive and Western Digital Drive, took those documents with him upon his departure, and accessed and used that information after his employment, including by storing at least one Intel

confidential document on his Microsoft-issued MS Surface computer, all in breach of these contractual requirements and in violation of federal and state law.

42.   Prior to his departure from Intel, Gupta had an exit interview where his confidentiality obligations, as presented in the TSAF, were reviewed with him.

### Gupta Downloads Intel Trade Secrets and Confidential Information from His Intel Laptop

43.   Gupta departed Intel on January 17, 2020.  Unbeknownst to Intel at the time, that same day—and just eleven days after signing the TSAF—Gupta transferred approximately *3,900* electronic files from his Intel computer to the Seagate Drive.  This transfer was confirmed through subsequent forensic analysis.[3]  These transferred documents included files that were marked Intel Top Secret and Intel Confidential, making it unmistakable that they contained Intel's protected information.

44.   Through subsequent forensic analysis, Intel determined that Gupta also loaded Intel confidential information and trade secrets onto a second USB drive, the Western Digital Drive.[4]  Despite repeated requests to Gupta to produce that drive, he still has not done so.  While Gupta alleges that he discarded the Western Digital Drive in the trash, Intel is left with significant reason to doubt the veracity of this assertion (given Gupta's misrepresentations in the TSAF, his deceptions about whether he was able to locate the Seagate Drive, and his omission concerning the existence of the Western Digital Drive).  Intel is left without any reliable information regarding its location, who has (or had) access to it, and how Gupta used it.

---

[3] At Microsoft's request and with Gupta's permission, Microsoft obtained the Seagate Drive from Gupta for an independent forensic analysis.
[4] Forensic analysis shows that these documents were created on December 31, 2019 or January 7, 2020.

45.     Inspection of the Western Digital Drive is critical because that is the only way to confirm whether the Intel confidential information contained on that drive has been transferred or copied to other devices.

**Gupta Routinely Accesses Intel Documents While Working for Microsoft**

46.     On January 21, 2020—four days after departing Intel—Gupta began working at Microsoft.  In the ensuing months, Gupta accessed, viewed, opened or otherwise interacted with more than one-hundred documents taken from Intel that he had stored in a folder labeled "Varun Intel Tenure."  He accessed these documents throughout his Microsoft employment:  forensic analysis revealed that between February 3, 2020 and July 23, 2020, Gupta plugged the Western Digital Drive into his MS Surface at least *114* times.[5]

47.     Forensic analysis further shows that on February 20, 2020, Gupta plugged the Seagate Drive into his MS Surface.  Further, Gupta stored a total of eight documents from either the Seagate Drive or the Western Digital Drive on the MS Surface.  Through forensic investigation, Intel has determined that at least one of these documents contains Intel confidential information and trade secrets.

48.     Forensic analysis also shows that on at least March 27, May 13, and May 14, 2020, Gupta plugged the Seagate Drive into a second computer.  Gupta later admitted that he "may have" plugged the Seagate Drive "into a USB hub connected to" his wife's computer— which Gupta now claims he can no longer access.

49.     Many of the documents that Gupta misappropriated contain Intel confidential information and trade secrets of the highest sensitivity that Intel maintains as confidential, that

---

[5] The forensic analysis shows that this occurred fourteen times in February, sixteen times in March, thirty-nine times in April, forty-two times in May, twice in June, and once in July.

are economically valuable to Intel because they are confidential, and that would be harmful to Intel's economic interests if in the hands of a competitor or purchaser—harm demonstrated by Gupta's use of the information here.

50.    For example, among the more than one-hundred documents that Gupta accessed on his MS Surface from the Western Digital Drive is a slide deck relating to Intel's confidential engagement strategy and product offerings for Xeon customized processors.  The document is proprietary, highly confidential, and could not have been obtained through Gupta's Microsoft employment.  Further, a copy of this document also resides on the Seagate Drive, confirming that its origin was Gupta's misappropriation from Intel.

51.    Also in the category of Intel documents that Gupta accessed on his MS Surface from the Western Digital Drive are several documents—some of which reflect "Intel Top Secret" designations—containing highly sensitive product specifications for customized Xeon processors.  This confidential information would be extremely useful to Gupta in his employment at Microsoft because it provided him information about Intel's manufacturing capacity and customized product offerings for other data center and cloud computing environments—which Gupta could then leverage in his negotiations with Intel on behalf of Microsoft.

**Gupta Leverages Intel Trade Secrets During Negotiations with Intel**

52.    While he continuously accessed the confidential information he misappropriated from Intel for months after his employment, Gupta also began to leverage Intel's confidential information and trade secrets—using both the documents he took and his knowledge of Intel's confidential information and trade secrets that he obtained during his employment and promised to maintain in confidence—in an effort to gain a competitive edge on behalf of his new

employer, Microsoft.  On June 15, 2020, in negotiations with Intel over the purchase of certain processors, Gupta explicitly referred to pricing offers and technical specifications that Intel had developed and marketed for other cloud computing environments to leverage favorable terms for Microsoft.

53.     In sum, Gupta used his knowledge of Intel's confidential information and trade secrets for his own benefit during his employment at Microsoft and accessed scores of Intel documents containing Intel's confidential information and trade secrets *during the very* period that he was negotiating with Intel on behalf of Microsoft.  Gupta accessed this information using the MS Surface—a computer owned by Microsoft.  He also accessed the Seagate Drive from a second computer that he now claims he cannot access.

### Gupta Attempts to Mislead Intel

54.     After Gupta's statements in his negotiations with Intel, it became clear to Intel that Gupta was using Intel confidential information and trade secrets to harm Intel.  Therefore, Intel initiated an information security investigation to determine the extent to which Gupta was not only relying on information that he retained by memory (in violation of his contractual obligation not to use or disclose that information post-employment), but also possessing Intel documents containing confidential information and trade secrets (in violation of his contractual obligation to return all such documents to Intel prior to his departure).

55.     As detailed above, Intel's Information Security Global Forensics Team initiated a forensic analysis of Gupta's activity on Intel's network leading up to his departure.

56.     This analysis showed that Gupta had taken thousands of Intel confidential documents from his Intel-issued computer and transferred them to at least one USB Drive—the Seagate Drive.

---

57.     On July 31, 2020, a member of Intel's Information Security Global Forensics Team interviewed Gupta concerning this finding and to determine whether Gupta still possessed any other Intel documents, and—if so—to determine where those documents were located.

58.     During that call, Gupta pretended not to know where the Seagate Drive was, claimed he had never accessed the Seagate Drive from any device other than his Intel-issued laptop (*i.e.*, that he had never accessed it after his Intel employment), and failed to disclose the existence of the Western Digital Drive to Intel (even though—evidence would later reveal—he had used it to access Intel documents on his MS Surface just eight days before).

59.     It was only after Microsoft, at Intel's request, got involved that Gupta was suddenly able to locate and produce the Seagate Drive.  On August 5, 2020, Gupta admitted to Microsoft that he was still in possession of the Seagate Drive, and subsequently provided it to Microsoft for independent analysis.

60.     In September 2020, Intel learned that Gupta had lied when he claimed that he had never plugged the Seagate Drive into any device other than his Intel-issued laptop and therefore never accessed it after his Intel employment.  The independent forensic analysis of the Seagate Drive revealed that Gupta had plugged the Seagate Drive into his Microsoft-issued MS Surface and at least one other computer.  Gupta later admitted that he "may have" plugged the Seagate Drive "into a USB hub connected to" his wife's computer, but claimed he no longer had access to that computer.

61.     In September 2020, based on independent forensic analysis of the MS Surface, Intel also learned that Gupta had misled Intel by failing to disclose the existence of the Western Digital Drive.  Analysis of the MS Surface uncovered the existence of the Western Digital Drive—showing at least 114 plug-ins of that drive to the MS Surface, during which Gupta

accessed approximately more than one-hundred Intel documents opened from the "Varun Intel Tenure" folder on that drive.

62.     Gupta claimed that he discarded the Western Digital Drive by throwing it in the trash "sometime towards the end of July 2020".  If Gupta is telling the truth this time, it means that he just happened to dispose of the Western Digital Drive right around Intel's Information Security Team contacted him on July 30, 2020.  Further, Gupta does not claim that he took any steps to ensure that the discarded Western Digital Drive did not fall into the hands of a third party; according to him, he simply placed it in a box that was later taken out to the trash.

63.     Because Gupta repeatedly provided false and misleading information to Intel in the course of Intel's investigation, Intel lost faith in Gupta's willingness to work in good faith to mitigate the serious harm he had already caused by his misappropriation and use of Intel's confidential information and trade secrets.  Further, Gupta's narrative about the disposition of the Western Digital Drive is wholly lacking in plausibility.  Gupta's story is all the more unreliable given that—before Microsoft got involved—he maintained that he did not know where the Seagate Drive was, much as he now claims he cannot locate the Western Digital Drive.

## Intel Attempts to Avoid Litigation

64.     At every turn, Intel has sought to protect its confidential information and trade secrets from further breach and misuse by seeking truthful information from Gupta about the nature and scope of his misappropriation.  The information that Gupta supplied to Intel in these efforts was increasingly implausible, evasive, and contradicted by additional information that Intel obtained in the course of its investigation.  Therefore, relief from this Court is necessary.

65.     Following Intel's discovery of the existence of the Western Digital Drive, Intel's outside counsel sent Gupta a letter on October 2, 2020, outlining the evidence proving that Gupta

possessed Intel confidential information and trade secrets and had used that information against

Intel (the "October 2 Letter"). That letter detailed Gupta's confidentiality obligations and

demanded that Gupta (1) immediately cease any copying, use, or disclosure of Intel's

confidential information; (2) agree to allow Intel's third-party forensic vendor to inspect any

electronic devices that Gupta used to transmit or store Intel's confidential information; and (3)

respond to a series of questions in writing by October 16, 2020. The purpose of these questions

was to identify, locate, retrieve, and protect Intel's confidential information in Gupta's

possession and to mitigate the harm caused by Gupta's unauthorized copying, use, and disclosure

of that information.

66. On October 14, 2020, Gupta's counsel contacted Intel's outside counsel to request

an extension of time to reply. In the hopes of resolving the matter and receiving a complete and

truthful response to the October 2 Letter, Intel's outside counsel agreed to the request, and to a

second request by Gupta's counsel to extend the deadline by an additional five days.

67. On November 4, 2020, Gupta's counsel responded to the October 2 Letter

("Gupta's Initial Response"). The response was unsatisfactory. For example, by and through his

counsel, Gupta repeatedly claimed he "did not recall" various events proven out by forensic

analysis (i.e., that he likely plugged the Seagate Drive into his wife's computer and that he

plugged the Western Digital Drive into his MS Surface). Gupta's Initial Response also contends

that the Intel documents found on both the Seagate Drive and the MS Surface were obtained

during Gupta's employment at Microsoft; Gupta claims that he obtained these either from a

Microsoft web portal or that Intel sent them to him when he was at Microsoft. That explanation

is non-sensical. The slide deck found on the MS Surface and many of the documents found on

the Seagate Drive or known to have been accessed from the Western Digital Drive are Intel

documents that are proprietary, highly confidential, and contain trade secrets.  It would have been contrary to Intel's interests to have provided those documents to anyone at Microsoft. Gupta has never provided any details to support these far-fetched assertions.

68.     Further, in Gupta's Initial Response, he repeatedly claimed he had not "copied, e-mailed, uploaded, downloaded, communicated or otherwise sent or conveyed" the Intel confidential information and trade secrets in his possession.  He continued to deny "using any Intel confidential information or trade secrets" or "housing any such information on Microsoft's systems."  But, as detailed herein, the forensic evidence shows otherwise.  Upon discussion with Gupta's counsel, it became clear that Gupta claimed to have interpreted the term "use" in the October 2 Letter narrowly—and contrary to its plain meaning.

69.     After providing Gupta a further opportunity to provide truthful and complete information, including by providing additional metadata demonstrating Gupta's possession and use of Intel documents containing confidential information and trade secrets, Gupta submitted a supplemental response, dated December 18, 2020, in which he continued to obfuscate.  He maintained that he did "not recall" the Intel slide deck containing trade secrets relating to its sale of Xeon customized processors, did "not have a recollection of it being downloaded" to his MS Surface, and did "not recall" why the slide deck would be on his MS Surface.  He also contended that he did not "have any further information or recollection to provide" regarding whether he used Intel's confidential information and trade secrets, but did find a way to remember— "categorically"—that "any interaction or inadvertent interaction with any Intel document after his departure from Intel was not done in order to benefit from the information contained in such document."

70.     To date, Gupta has not provided the Western Digital Drive for inspection or any plausible explanation concerning his claimed inability to produce it.  Gupta also has not provided the other computer that he used to access documents on the Seagate Drive.

71.     Because of Gupta's lack of candor, and because Intel has not been able to confirm that Gupta is no longer in possession of Intel's confidential information and trade secrets or the extent to which Gupta used or distributed that information, Intel is left with no choice but to seek relief from this Court.

72.     The confidential and trade secret information that Gupta misappropriated is highly sensitive, and Intel must rely on this Court to enjoin Gupta's wrongful possession and willful and malicious misappropriation of Intel's confidential information and trade secrets.  Until Intel has ascertained the full extent of Gupta's possession, use, and distribution of its confidential information and trade secrets, "[m]isuse of that treasure trove remains an ever-present danger wholly at [Gupta's] whim."  *Waymo*, 2017 WL 2123560, at *11.

### FIRST CAUSE OF ACTION
### (Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)

73.     Intel alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 72 above.

74.     Gupta violated the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, by misappropriating the following:  (a) financial, marketing, and strategic information related to Intel's customized Xeon processors for which Gupta was a product marketing engineer, including pricing structure and strategies, definition of the parameters for such processors, and manufacturing capabilities; (b) the thousands of Intel documents downloaded from Gupta's Intel computer to the Seagate Drive before his departure from Intel; (c) the Intel

document Gupta stored on the MS Surface; and (d) the more than one-hundred Intel documents that Gupta accessed, viewed, opened, or otherwise interacted with on his MS Surface using the folder on the Western Digital Drive named "Varun Intel Tenure" (collectively referred to as the "Intel Trade Secrets").

75.     The Intel Trade Secrets relate to technology products used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

76.     The Intel Trade Secrets are not generally known to the public or generally known in the industry, and their value is derived from the fact that they are kept secret.

77.     Some of the Intel Trade Secrets are a compilation of information that standing alone might not be a trade secret, but in the aggregate, constitute a protectable trade secret.

78.     The Intel Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.  These efforts include, but are not limited to: (a) password protection to access Intel's systems containing the Intel Trade Secrets; (b) requiring incoming employees, including Gupta, to sign an Employment Agreement, in which they promise to hold in strict confidence, and not disclose or use, any Intel confidential information and trade secrets outside of their employment with Intel; and (c) requesting outgoing employees, including Gupta, to sign the TSAF, in which they acknowledge their receipt of confidential information and trade secrets during their employment with Intel and represent that they will not retain, use, or disclose Intel's confidential information and trade secrets after their employment ends.

79.     Intel has kept the Intel Trade Secrets confidential and has not disclosed them outside of Intel except under non-disclosure agreements with third parties that appropriately safeguard the secrecy of the information.

80.     Intel derives economic value, actual and potential, from the Intel Trade Secrets not being generally known to persons who could obtain economic value from their use.

81.     The Intel Trade Secrets would be economically valuable in the hands of Intel's competitors, who could use it to compete unfairly with Intel in the design, manufacture, marketing, and pricing of comparable products.  Similarly, the Intel Trade Secrets would be economically valuable in the hands of Intel's customers, who could use it to gain an unfair advantage over Intel in negotiations concerning product specifications and pricing.

82.     Gupta was under a duty to keep the Intel Trade Secrets confidential during his Intel employment and not to use or disclose the Intel Trade Secrets following his Intel employment.

83.     Gupta signed an Employment Agreement with Intel wherein he agreed to keep Intel's information, such as the Intel Trade Secrets, confidential during his Intel employment and not to use or disclose the Intel Trade Secrets following his Intel employment.

84.     Gupta signed a TSAF in which he confirmed his confidentiality obligations to Intel, acknowledged that he was given access to the Intel Trade Secrets during his employment, and represented that he would return any copies of the Intel Trade Secrets in his possession or custody upon his departure from Intel.

85.     Despite these confidentiality obligations and promises, on January 17, 2020, Gupta downloaded the Intel Trade Secrets from his Intel computer to at least the Seagate Drive, and took these documents with him upon his departure from Intel, in violation of his contractual

duties to Intel.  Gupta also downloaded Intel documents containing Intel confidential information

and trade secrets to the Western Digital Drive on December 31, 2019 or January 7, 2020, and

took this drive with him upon his departure from Intel, again in violation of his contractual duties

to Intel.  In so doing, Gupta acquired the Intel Trade Secrets by improper means.

86.     Gupta later used the Intel Trade Secrets against Intel in negotiations for the

purchase of Xeon processors by his new employer.  Gupta went on to mislead and provide false

information to Intel's Information Security Global Forensics Team investigator.  Gupta has yet to

provide the Western Digital Drive, which forensic evidence indicates contains some of the Intel

Trade Secrets, hampering Intel's efforts to locate, protect, and preserve the Intel Trade Secrets.

87.     Further, Gupta accessed documents containing the Intel Trade Secrets for the

purpose of using the Intel Trade Secrets to gain a competitive advantage and benefit himself in

his employment at Microsoft.

88.     "[T]he [DTSA's and OTSA's] text contemplates three theories of liability:

(1) acquisition, (2) disclosure, or (3) use."  *Catalinbread LLC v. Gee*, No. 18-cv-01795,

2019 WL 1586756, at *6 (D. Or. Apr. 12, 2019) (quoting *Cave Consulting Grp., Inc. v. Truven

Health Analytics Inc.*, No. 15-CV-02177, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017)).

Gupta engaged in all three activities, in each case in violation of the DTSA.

89.     Gupta acquired the Intel Trade Secrets by improper means when he violated the

duty owed under his Employment Agreement by copying the Intel Trade Secrets onto at least the

Seagate Drive and the Western Digital Drive and taking these documents with him upon his

departure.  Further, he deceived Intel by making fraudulent representations in the TSAF, where

he claimed that he did not possess any Intel confidential information and would return any Intel

documents to Intel prior to his departure.  These misrepresentations constitute further improper fraudulent means that enabled his unlawful acquisition and retention of the documents.

90.    Gupta disclosed certain of the Intel Trade Secrets by storing them on his MS Surface.

91.    Gupta used the Intel Trade Secrets by accessing them during his employment at Microsoft and deploying them and the confidential information and trade secrets they contained *against* Intel in negotiations.

92.    Gupta's wrongful conduct in misappropriating the Intel Trade Secrets has caused and will continue to cause Intel great and irreparable harm.  Intel has no adequate remedy at law for the harm being suffered.

93.    As a direct and proximate result of Gupta's conduct, Intel has suffered damages in an amount to be determined at trial but well in excess of $75,000.  These damages include the economic harm that Intel suffered when Gupta used the Intel Trade Secrets against it in negotiations on behalf of his new employer, as well as costs that Intel incurred to identify the nature and scope of Gupta's wrongdoing so that it could take steps to protect Intel's Trade Secrets following Gupta's misappropriation.

94.    Gupta willfully and maliciously misappropriated the Intel Trade Secrets by deliberately attempting to injure Intel's business and improve his own standing and business, thereby entitling Intel to an award of attorneys' fees pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(D).

95.    Gupta's conduct, as described above, was aggravated by the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary and punitive damages, as it was accomplished through a breach of confidence and trust and/or was committed

knowingly and with conscious indifference to Intel's property rights.  18 U.S.C. § 1836(b)(3)(C).

Further, Gupta's TSAF, signed on January 6, 2020, informed Gupta of the DTSA whistleblower

provision, thereby making his conduct eligible for exemplary damages under the DTSA.  *Id.*

96.     Based on the foregoing, Intel prays that a temporary restraining order, and

temporary and permanent injunctions, be issued ordering that Gupta or his representatives,

agents or designees be restrained from:

a.     Violating any terms of his Employment Agreement;

b.     Obtaining, accessing, using, possessing, retaining, transmitting, copying,

or disclosing any of Intel's confidential, proprietary, or trade secret information, including the

Intel Trade Secrets;

c.     Possessing the Seagate Drive or the Western Digital Drive; and

d.     Deleting, destroying, altering, or erasing any evidence related to this

action, including but not limited to any hard or electronic copies of any information, documents,

or data Gupta copied, accessed, or took from Intel; and further ordering that Gupta and his

representatives, agents, and designees:

e.     Within 2 days of the issuance of this Order, return to Intel all information,

documents, and tangible things in Gupta's possession, custody, or control, whether in physical or

digital format, including any and all copies thereof, that contain Intel's confidential information;

f.     Within 2 days of the issuance of this Order, provide to Intel the Western

Digital Drive.  Intel can conduct an inspection of the device, preserve evidence on the device for

this litigation, and return all Intel confidential, proprietary, or trade secret documents on the

device to Intel;

g.      Within 2 days of the issuance of this Order, identify to Intel all devices to which Gupta connected the Seagate Drive or the Western Digital Drive after January 17, 2020;

h.      Within 5 days of the issuance of this Order, allow Intel to inspect Gupta's personal email using targeted search terms in order to determine whether Gupta saved, sent, or otherwise maintained or distributed the Intel Trade Secrets or other Intel confidential information or trade secrets via personal email; and

i.      After the return of all Intel documents pursuant to the above, Gupta shall provide a certification to Intel that he has returned and is not in possession—in electronic or hard copy form—of any confidential, proprietary, or trade secret Intel documents or documents containing any confidential, proprietary, or trade secret Intel information, including the Intel Trade Secrets.  The certification shall confirm that he has reviewed all personal email accounts, cloud-based storage accounts, phones, tablets, computers, removable storage devices, back-up drives, hard copy files, and any other location that Gupta believes he could have retained or stored confidential Intel documents or communications.  The certification shall be signed under penalty of perjury and notarized.

## SECOND CAUSE OF ACTION
### (Injunctive Relief and Damages:  Misappropriation of Trade Secrets Under Oregon Trade Secrets Act, Or. Rev. Stat. § 646.461 *et seq.*)

97.     Intel alleges and incorporates by reference each of the allegations contained in paragraphs 1 through 96 above.

98.     The Intel Trade Secrets contain information maintained as confidential by Intel because such information is not generally known or readily ascertainable through proper means by persons including competitors and purchasers of Intel, who may obtain economic value from the use of the Intel Trade Secrets.  Intel does not publicly disclose information about its highly

confidential development techniques, technical capability, manufacturing capacity, cost bases, marketing strategy, pricing structures pricing decisions, and technology features for customized Xeon processors.

99.    Intel takes reasonable efforts to protect the secrecy of the Intel Trade Secrets through physical security, employment agreements, and electronic information security measures.  The Intel Trade Secrets qualify as trade secrets under the Oregon Trade Secrets Act ("OTSA"), Or. Rev. Stat. § 646.461(4) (defining "trade secrets" to include "information, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique or process that: (a) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.").

100.    Intel has kept the Intel Trade Secrets confidential and has not disclosed them outside of Intel except under non-disclosure agreements with third parties that appropriately safeguard the secrecy of the information.

101.    Intel derives economic value, actual and potential, from the Intel Trade Secrets not being generally known to persons who could obtain economic value from their use.

102.    The Intel Trade Secrets would be economically valuable in the hands of Intel's competitors, who could use it to compete unfairly with Intel in the design, manufacture, marketing, and pricing of comparable products.  Similarly, the Intel Trade Secrets would be economically valuable in the hands of Intel's customers, who could use it to gain an unfair advantage over Intel in negotiations concerning product specifications and pricing.

103.    The Intel Trade Secrets could give (and, Intel believes, already have given) a competitor or purchaser valuable information that harms Intel.

104.    Gupta was under a duty to keep the Intel Trade Secrets confidential during his Intel employment and not to use or disclose the Intel Trade Secrets following his Intel employment.

105.    Gupta signed an Employment Agreement with Intel wherein he agreed to keep Intel's information, such as the Intel Trade Secrets, confidential during his Intel employment and not to use or disclose the Intel Trade Secrets following his Intel employment.

106.    Gupta signed a TSAF in which he confirmed his confidentiality obligations to Intel, acknowledged that he was given access to the Intel Trade Secrets during his employment, and represented that he would return any copies of the Intel Trade Secrets in his possession or custody upon his departure from Intel.

107.    Despite these confidentiality obligations and promises, on January 17, 2020, Gupta downloaded the Intel Trade Secrets from his Intel computer to at least the Seagate Drive, and took these documents with him upon his departure from Intel, in violation of his contractual duties to Intel.  Gupta also downloaded Intel documents containing Intel confidential information and trade secrets to the Western Digital Drive on December 31, 2019 or January 7, 2020, and took this drive with him upon his departure from Intel, again in violation of his contractual duties to Intel.  In so doing, Gupta acquired the Intel Trade Secrets by improper means.

108.    Gupta later used the Intel Trade Secrets against Intel in negotiations for the purchase of Xeon processors by his new employer.  Gupta went on to mislead and provide false information to Intel's Information Security Team investigator.  Gupta has yet to provide the

Western Digital Drive, which forensic evidence indicates contains some of the Intel Trade Secrets, hampering Intel's efforts to locate, protect, and preserve the Intel Trade Secrets.

109.    Further, Gupta accessed documents containing the Intel Trade Secrets for the purpose of using the Intel Trade Secrets to gain a competitive advantage and benefit himself in his employment at Microsoft.

110.    "[T]he [DTSA's and OTSA's] text contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Catalinbread LLC*, 2019 WL 1586756, at *6 (quoting *Cave Consulting Grp., Inc. v. Truven Health Analytics Inc.*, No. 15-CV-02177, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017)).  Gupta engaged in all three activities, in each case in violation of the OTSA.

111.    Gupta acquired the Intel Trade Secrets by improper means when he violated the duty owed under his Employment Agreement by copying the Intel Trade Secrets onto at least the Seagate Drive and the Western Digital Drive and taking these documents with him upon his departure.  Further, he deceived Intel by making fraudulent representations in the TSAF, where he claimed that he did not possess any Intel confidential information and would return any Intel documents to Intel prior to his departure.  These misrepresentations constitute further improper fraudulent means that enabled his unlawful acquisition and retention of the documents.

112.    Gupta disclosed certain of the Intel Trade Secrets by storing them on his MS Surface.

113.    Gupta used the Intel Trade Secrets by accessing them during his employment at Microsoft and deploying them and the confidential information and trade secrets they contained *against* Intel in negotiations.

114.     Gupta's wrongful conduct in misappropriating the Intel Trade Secrets has caused and will continue to cause Intel great and irreparable harm.  Intel has no adequate remedy at law for the harm being suffered.

115.     As a direct and proximate result of Gupta's conduct, Intel has suffered damages in an amount to be determined at trial but well in excess of $75,000.  These damages include the economic harm that Intel suffered when Gupta used the Intel Trade Secrets against it in negotiations on behalf of his new employer, as well as costs that Intel incurred to identify the nature and scope of Gupta's wrongdoing so that it could take steps to protect Intel's Trade Secrets following Gupta's misappropriation.

116.     Gupta willfully and maliciously misappropriated the Intel Trade Secrets by deliberately attempting to injure Intel's business and improve his own standing and business, thereby entitling Intel to an award of attorneys' fees pursuant to the OTSA.  ORS 646.467(3).

117.     Gupta's conduct, as described above, was aggravated by the kind of willfulness, wantonness and malice for which the law allows the imposition of exemplary and punitive damages.  Moreover, Gupta's conduct was accomplished through a breach of confidence and trust and/or was committed knowingly and with conscious indifference to Intel's property rights.  Therefore, Intel is entitled to recover exemplary and punitive damages from Gupta pursuant to the OTSA.  Or. Rev. Stat. § 646.465(3).

118.     OTSA specifically authorizes injunctive relief to remedy misappropriation and prevent the threatened misappropriation of trade secrets.  Or. Rev. Stat. § 646.463.

119.     Based on the foregoing, Intel prays that a temporary restraining order, and temporary and permanent injunctions, be issued, as set forth in Paragraph 96 above.

## THIRD CAUSE OF ACTION
### (Injunctive Relief and Damages:  Breach of Contract (Employment Agreement))

120.    Intel alleges and incorporates by reference each of the allegations contained in

paragraphs 1 through 119 above.

121.    Intel and Gupta entered into a valid and enforceable Employment Agreement.

122.    In the Employment Agreement, Gupta promised:

> I will not use (except for the benefit and at the direction of the Intel Group)
> and will hold in confidence and not disclose (without written authorization
> from a company in the Intel Group, except to the extent I am authorized to
> do so in the course of my duties) any proprietary information or trade secret
> (technical, marketing, planning, financial, personnel or otherwise) of the
> Intel Group or of any third party to which I gain access pursuant to my
> employment, until such information becomes generally and rightfully
> known outside the Intel Group without non-disclosure restriction, or for the
> maximum period of time for maintaining trade secrets as permitted by law
> in the jurisdiction in which I am employed if such period is shorter.  I agree
> not to make unauthorized copies of such confidential information and to
> return to the Intel Group immediately upon my termination or upon request
> by my Employer . . . all tangible forms of such confidential information,
> including but not limited to drawings, computerized data or programs,
> specifications, documents, devices, models, employee lists, customer lists
> or phone books, or any other Intel Group confidential information.

Ex. 1, ¶ 3.

123.    Intel has complied with all of its material obligations under the Employment

Agreement.

124.    Gupta breached the foregoing provision of the Employment Agreement by

downloading and taking the Intel Trade Secrets and other Intel proprietary information

(including by downloading, on January 17, 2020, thousands of Intel files and documents such as

pricing information and proprietary information regarding customized Xeon processors) and then

using the Intel Trade Secrets and other Intel proprietary information against Intel in subsequent

negotiations and regularly accessing the Intel Trade Secrets and other Intel proprietary information during his employment at Microsoft.

125.    Gupta further breached the foregoing provision of the Employment Agreement by using and disclosing his knowledge, acquired during his Intel employment, of the Intel Trade Secrets and other Intel proprietary information after his employment by Intel, without Intel's authorization, and for his own benefit.

126.    Gupta's breaches have directly, substantially and irreparably harmed Intel. Further, Gupta agreed in the Employment Agreement that "any breach, violation or evasion of this provision will result in immediate and irreparable injuries and harm to the Intel Group." Ex. 1, ¶ 3.

127.    Intel has no adequate remedy at law for Gupta's breach of his Employment Agreement.  Unless restrained, Gupta's use and continued possession of the Intel Trade Secrets will continue to cause Intel serious and irreparable harm, both during the pendency of this action and thereafter.

128.    As a direct and proximate result of Gupta's conduct, Intel has suffered damages in an amount to be determined at trial but well in excess of $75,000.  These damages include the economic harm that Intel suffered when Gupta used the Intel Trade Secrets against it in negotiations on behalf of his new employer, as well as costs that Intel incurred to identify the nature and scope of Gupta's wrongdoing so that it could take steps to protect Intel's Trade Secrets following Gupta's misappropriation.

129.    Based on the foregoing, Intel prays that a temporary restraining order, and temporary and permanent injunctions, be issued, as set forth in Paragraph 96 above.

130.     Gupta's wrongful conduct has caused Intel to require legal counsel, including the undersigned attorneys from Williams & Connolly LLP and Miller Nash Graham & Dunn LLP in connection with this matter.  Intel has agreed to pay the undersigned attorneys a reasonable fee for their services.  Intel asks this Court award Intel its reasonable attorneys' fees and other costs pursuant to Section 20.075 of the Oregon Statutes; pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(D); and pursuant to the OTSA, Or. Rev. Stat. § 646.467(3).

131.     The requirements of the DTSA and the OTSA have been met.  Upon information and belief, Gupta's conduct, as described above, was aggravated by the kind of willfulness, wantonness and malice for which the law allows the imposition of attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Intel prays for judgment against Gupta as follows:

1.     For a temporary restraining order, a preliminary injunction and a permanent injunction enjoining Gupta and his agents, representatives and designees from the following:

a.     Violating any terms of his Employment Agreement;

b.     Obtaining, accessing, using, possessing, retaining, transmitting, copying, or disclosing any of Intel's confidential, proprietary, or trade secret information, including the Intel Trade Secrets;

c.     Possessing the Seagate Drive or the Western Digital Drive; and

d.     Deleting, destroying, altering, or erasing any evidence related to this action, including but not limited to any hard or electronic copies of any information, documents, or data Gupta copied, accessed, or took from Intel; and further ordering that Gupta and his representatives, agents, and designees:

e.      Within 2 days of the issuance of this Order, return to Intel all information, documents, and tangible things in Gupta's possession, custody, or control, whether in physical or digital format, including any and all copies thereof, that contain Intel's confidential information;

f.      Within 2 days of the issuance of this Order, provide to Intel the Western Digital Drive.  Intel can conduct an inspection of the device, preserve evidence on the device for this litigation, and return all Intel confidential, proprietary, or trade secret documents on the device to Intel;

g.      Within 2 days of the issuance of this Order, identify to Intel all devices to which Gupta connected the Seagate Drive or the Western Digital Drive after January 17, 2020;

h.      Within 5 days of the issuance of this Order, allow Intel to inspect Gupta's personal email using targeted search terms in order to determine whether Gupta saved, sent, or otherwise maintained or distributed the Intel Trade Secrets or other Intel confidential information or trade secrets via personal email; and

i.      After the return of all Intel documents pursuant to the above, Gupta shall provide a certification to Intel that he has returned and is not in possession—in electronic or hard copy form—of any confidential, proprietary, or trade secret Intel documents or documents containing any confidential, proprietary, or trade secret Intel information, including the Intel Trade Secrets.  The certification shall confirm that he has reviewed all personal email accounts, cloud-based storage accounts, phones, tablets, computers, removable storage devices, back-up drives, hard copy files, and any other location that Gupta believes he could have retained or stored confidential Intel documents or communications.  The certification shall be signed under penalty of perjury and notarized.

2.      For an award of all actual and compensatory damages caused by Gupta's violations of the DTSA, the OTSA, his Employment Agreement, and his TSAF;

3.      For an award of its reasonable attorneys' fees, including the fees of the undersigned attorneys from Williams & Connolly LLP and Miller Nash Graham & Dunn LLP retained in connection with this matter, and other costs, pursuant to Section 20.075 of the Oregon Statutes; the DTSA, 18 U.S.C. § 1836(b)(3)(D); and the OTSA, Or. Rev. Stat. § 646.467(3);

4.      For an award of exemplary/punitive damages, pursuant to the DTSA, 18 U.S.C. § 1836(b)(3)(C); and the OTSA, Or. Rev. Stat. § 646.465(3); and

5.      For such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Intel demands trial by jury on all claims and issues so triable.

DATED:  February 5, 2021.

Respectfully submitted,

/s/ *Michael Porter*
Michael Porter, OSB No. 003560
mike.porter@millernash.com
Iván Resendiz Gutierrez, OSB No. 154617
ivan.resendiz@millernash.com
**MILLER NASH GRAHAM & DUNN LLP**
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204
Telephone: 503.205.2330

Katherine M. Turner, D.C. State Bar No. 495528
(*pro hac vice* forthcoming)
kturner@wc.com
Troy C. Homesley, N.Y. State Bar No. 5566914
(*pro hac vice* forthcoming)
(Admitted only in N.Y.  Practice supervised by
D.C. Bar members pursuant to D.C. Court of
Appeals Rule 49(c)(8))
thomesley@wc.com
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street N.W.
Washington, D.C. 20005
Telephone: 202.434.5487

*Attorneys for Plaintiff Intel Corporation*

## CERTIFICATE OF COMPLIANCE WITH CIVIL LOCAL RULE 7-2(b)

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,265 words, including headings, footnotes, and quotations, but excluding the caption, signature block, exhibits, and any certificates of counsel.

*/s/ Michael Porter*
Michael Porter